**NOT FOR PUBLICATION**

## UNITED STATES DISTRICT COURT
## DISTRICT OF NEW JERSEY

|  |  |  |
|---|---|---|
| | : | |
| MADISON FINANCIAL, LLC, | : | |
| | : | |
| Plaintiff, | : | **OPINION** |
| | : | |
| v. | : | Civ. No. 01-3830 (WHW) |
| | : | |
| HUNTS POINT COOPERATIVE MARKET, | : | |
| INC., a New York Cooperative Corporation, | : | |
| | : | |
| Defendant. | : | |
| | : | |

**Walls, Senior District Judge**

Plaintiff Madison Financial, LLC ("Madison") seeks to collect money due on five accounts receivable (the "Subject Accounts") that it purchased from Westway Industries, Inc. (successor-in-interest to Westchester Fine Grade, Inc.) ("Westway"). Madison asserts claims of breach of contract and collection of accounts under Article 9 of the Uniform Commercial Code (the "UCC"), as codified in N.J.S.A. § 12A:9-101 - 710 (2007), against Defendant Hunts Point Cooperative Market, Inc. ("Hunts Point"), the account debtor on the Subject Accounts. The Court has original subject matter jurisdiction over this matter under 28 U.S.C. § 1332 because there is diversity of citizenship between Madison and Hunts Point and the amount in controversy exceeds $75,000.00. (Final Pretrial Order ("PTO") ¶ 1.) Hunts Point has not raised any objection to the Court's exercise of personal jurisdiction. (Id.)

The facts material to this controversy are not seriously challenged; the legal conclusions from such facts are the subject of intense argument by the parties. After a bench trial, the Court

NOT FOR PUBLICATION

makes the following fact findings and conclusions of law:

**FINDINGS OF FACT**

**1.**      **Madison's Formation**

Plaintiff Madison is New Jersey limited liability company engaged in the business of factoring accounts receivables. (PTO, Ex. A ¶ 1.) It was initially formed on June 10, 1999, with three members – two companies represented respectively by John Marozzi and Vincent Morocco, who were both investors, and a company owned by Christopher Maguire, known as Service Capital Corp. ("Service Capital"). (Id. ¶ 2.)

Service Capital was a factoring brokerage company. (Trial Tr. (Maguire) 36, May 27, 2004.) Before forming and operating Service Capital, Maguire had owned another factoring brokerage company, Bridgewater Capital. (Id. 34-36.) As brokers Service Capital and Bridgewater Capital had procured work for several factors. (Id. 35-37.) By the time that Madison was formed in June 1999, Maguire had been in the factoring brokerage business for several years. (Id. 34-35.)

About March 1999, Maguire and George Sneddon, who was then Maguire's father-in-law, formed Madison Financial Corporation, a New Jersey corporation, to provide factoring services. (Trial Tr. (Sneddon) 5-7, May 26, 2004; Trial Tr. (Maguire) 37-38, May 27, 2004.) Sneddon held 100% of the stock of Madison Financial Corporation. (Pl.'s Ex. 4; Trial Tr. (Sneddon) 6-7, May 26, 2004.)

Maguire was later introduced to Marozzi, a part-owner of Cherbrooke Associates, L.L.C. ("Cherbrooke"). (Trial Tr. (Marozzi) 16-18, Mar. 2, 2004.) Maguire was seeking investors for his

-2-

NOT FOR PUBLICATION

new factoring business. (Id. 17.) Ultimately, about June 1999, Marozzi and Morocco, as well as

other individuals, invested in a new factoring company with Maguire – Madison. (Id. 17-18.)

Marozzi, Morocco, and the other investors did not acquire shares of, or any interest in, the

pre-existing Madison Financial Corporation; rather, Madison was formed as a new and distinct

limited liability company. (Pl.'s Exs. 1, 3.) Pursuant to Madison's Operating Agreement dated

November 12, 1999 (the "Operating Agreement"), Madison initially had three members – two

companies, Cherbrooke and The Morocco Group, LLC ("Morocco Group"), represented by

Marozzi and Morocco, respectively, and a third company owned by Maguire, referred to as

"Service Capital Corp., L.L.C." in the Operating Agreement. (Pl.'s Ex. 3 at D000000261.)

Pursuant to the Operating Agreement, Madison was to be managed by a board of managers

appointed by its members. (Id. at D000000269.) Madison did not have a "managing member."

(Id.; Trial Tr. (Marozzi) 19, Mar. 2, 2004.)

Donna Brewer-Rossi (formerly, Donna Brewer), who is now Madison's Controller, came

to work for Madison in June 1999. (Trial Tr. (Brewer-Rossi) 4-7, June 1, 2004.) By then she had

approximately five years of experience working in the factoring industry, including experience

with managing the accounts of factoring customers. (Id. 3-4.) She had previously worked as a

factoring assistant and broker, during which time she had met Maguire as a result of Service

Capital's business with her employer. (Id. 3-5.)

By Stock Purchase Agreement dated December 21, 1999, Madison purchased 100% of

the stock of Madison Financial Corporation. (PTO, Ex. A ¶ 3; Pl.'s Ex. 5; Trial Tr. (Marozzi) 24,

Mar. 2, 2004.) Madison succeeded to the interests of Madison Financial Corporation. (PTO, Ex.

-3-

**NOT FOR PUBLICATION**

A ¶ 15; Pl.'s Ex. 5.)

As detailed later, Madison later discovered that Maguire had been diverting payments and stealing from it. (Trial Tr. (Marozzi) 25-27, Mar. 2, 2004.) As a result, by an Assignment dated January 11, 2001, Maguire's interest in Madison, which he had held through "Service Capital Corp., L.L.C.," was assigned to the remaining Madison members – Cherbrooke and Morocco Group. (PTO, Ex. A ¶ 5; Pl.'s Ex. 4; Trial Tr. (Marozzi) 25-26, Mar. 2, 2004.) Maguire resigned from his position with Madison and was barred from representing Madison in any capacity whatsoever. (Pl.'s Ex. 4 at 2.)

### 2. Madison's Business Operations

In its factoring business, Madison would generally advance funds to its customers on the basis of the customer's accounts receivable. (Trial Tr. (Marozzi) 41-42, Mar. 2, 2004.) Madison would advance a percentage – typically 70% – of the face amount of a given account receivable, which was then purchased by Madison. (Id.) The account debtor would be notified of the purchase and would make payments on the account to Madison. (Id.) Pursuant to its agreement with its customer, Madison would collect a fee on the account and, when appropriate, credit its customer any amounts due. (Id.)

At all relevant times, Maguire and Sneddon worked out of Madison's Bridgewater, New Jersey office, which was also used by Maguire's company Service Capital. (PTO, Ex. A ¶ 4.) At all relevant times, Marozzi and Brewer-Rossi worked out of Madison's Pine Brook, New Jersey office. (Id.)

Maguire's primary role, through Service Capital, was to find business for Madison. (Trial

NOT FOR PUBLICATION

Tr. (Maguire) 39, May 27, 2004.) Maguire was responsible for locating potential customers, analyzing their financial status, and making decisions as to which accounts Madison would factor. (Id.)

Sneddon was responsible for executing the necessary documentation for each account to be purchased by Madison. (Trial Tr. (Sneddon) 8-10, May 26, 2004; Trial Tr. (Maguire) 39, May 27, 2004.) This documentation included factoring agreements, assignments, estoppel agreements (known as "notices of purchase"), UCC Forms, and notice letters. (E.g., Pl.'s Ex. 21.) Madison's documents were based on standard forms used generally in the factoring industry, the general form of which had been previously approved by its attorneys. (Id. 40.) Sneddon prepared these documents at the Bridgewater office. (Trial Tr. (Sneddon) 8, May 26, 2004.)

Sneddon was also responsible for verifying the accounts before Madison advanced funds. (Id. 19-20.) For accounts where the account debtor was a private entity, Madison generally verified that the amounts stated on presented invoices were actually due and owing by requiring the account debtor to sign notices of purchase acknowledging those facts. (Id. 9; Trial Tr. (Brewer-Rossi) 7-8, June 1, 2004.) Sneddon explained that the notices of purchase:

> [N]otif[ied] all parties involved that a company had presented an invoice to Madison Financial LLC that they were selling that invoice to Madison and that we had to make sure that all parties were aware of that the payments for those invoices would go to Madison Financial LLC.
>
> . . . .
>
> There were typically three parties involved in a transaction, Madison Financial LLC, our customer and their customer. So all three parties had to sign this document acknowledging that that invoice was being processed and funded against.

**NOT FOR PUBLICATION**

(Trial Tr. (Sneddon) 9-10, May 26, 2004.) Sneddon would generally obtain a signed notice of

purchase for each account. (Id. 15.) For the first notice of purchase from a new account debtor,

Sneddon typically would call the account debtor to verify the signature on the notice of purchase.

(Id. 20.) For accounts where the account debtor was a public entity, Madison's procedure was

different, obtaining instead "all monies assignments." (Trial Tr. (Marozzi) 3, Mar. 3, 2004; Trial

Tr. (Maguire) 54-55, May 27, 2004; Trial Tr. (Brewer-Rossi) 7-8, June 1, 2004.) Signed notices

of purchase were not necessary for public accounts. (Trial Tr. (Marozzi) 3, Mar. 3, 2004; Trial

Tr. (Sneddon) 14, May 26, 2004.)

Once all necessary documentation had been received, Sneddon would fax a "funding

request," with supporting documentation, to Brewer-Rossi at Madison's Pine Brook office. (Trial

Tr. (Sneddon) 8, May 26, 2004; Trial Tr. (Brewer-Rossi) 11-12, June 1, 2004; see, e.g., Pl.'s Ex.

21.) Once she received that documentation, Brewer-Rossi was authorized to make a wire transfer

to Madison's customer. (Trial Tr. (Brewer-Rossi) 10-12, June 1, 2004.) She would calculate the

amount of the advance – as stated above, typically 70% of the invoice purchased – and then

arrange for a wire transfer of that sum to the customer. (Id. 7-8, 17.) Once completed, Brewer-

Rossi would enter the invoice amount purchased, the amount advanced to the customer, and all

remaining information on aging and summary reports. (Id. 8-9.) The primary responsibility of the

Pine Brook office was to make fundings and to handle all of the accounting for the fundings and

payments. (Trial Tr. (Marozzi) 21-22, Mar. 2, 2004.)

### 3.      Madison's Purchase of Westway's Accounts Receivable

Westway, a New York corporation, was engaged in the business of providing

NOT FOR PUBLICATION

construction services. (PTO, Ex. A ¶ 10.) Pursuant to an Accounts Receivable Purchase

Agreement dated as of January 10, 2000 (the "Purchase Agreement"), and in consideration of

various advances to be made by Madison to Westway, Madison purchased the existing and future

accounts receivable of Westway. (Id. ¶ 16; Pl.'s Ex. 8.) After entering into the Purchase

Agreement, Westway submitted to Madison invoices or payment requisitions evidencing its

accounts receivable. (Trial Tr. (Marozzi) 40-41, Mar. 2, 2004; Trial Tr. (Sneddon) 13, May 26,

2004.) Madison purchased the accounts receivable from Westway and advanced funds to

Westway pursuant to the terms of the Purchase Agreement. (Trial Tr. (Marozzi) 40-42, Mar. 2,

2004; Trial Tr. (Sneddon) 13, May 26, 2004.) In accordance with Madison's usual procedure, the

private account debtors were notified in writing – in notices of purchase – that all payments on

the accounts receivable were to be made to Madison. (E.g., Pl.'s Exs. 21 at P000003, 23 at

P000047, 25 at P000040, 26 at P000058, 27 at P000052.) In accordance with the Purchase

Agreement, Westway submitted to Madison requisitions reflecting monies due from account

debtors. (Trial Tr. (Marozzi) 40-42, Mar. 2, 2004.) The accounts receivable evidenced by those

requisitions were purchased by Madison in accordance with the terms of the Purchase

Agreement. (E.g., Pl.'s Exs. 21 at P000004, 23 at P000048, 26 at P000061, 28 at P000067.)

    **4.**    **Hunts Point's Contracts with Westway**

    Defendant Hunts Point is a cooperative wholesale meat distribution market located in the

Bronx, New York. (PTO, Ex. A ¶ 7.) Sometime in mid-1999, Hunts Point decided to construct a

new refrigerated warehouse (the "Project"). (Id. ¶ 17.) As part of the Project, Hunts Point entered

into two trade contracts with Westway (the "Westway Contracts"), one for concrete work dated

NOT FOR PUBLICATION

February 16, 2000, and a second for site and utilities work dated February 29, 2000. (Id. ¶ 20;

Def.'s Exs. 1, 2.) During the course of construction, the Project's construction manager, Jeffrey

M. Brown Associates, Inc., submitted applications for payment to Hunts Point. (PTO, Ex. A ¶

21.) Hunts Point's General Manager, Bruce Reingold, or another representative reviewed each of

Westway's payment applications for work on the Project. (Trial Tr. (Reingold) 15-16, June 23,

2004.) Each of those applications was approved by Hunts Point and forwarded to government

authorities for payment. (Id.)

  **5.**  **Madison's Purchase of the Subject Accounts**

    The accounts receivable purchased by Madison from Westway included the Subject

Accounts, on which Hunts Point was Westway's account debtor. (Trial Tr. (Sneddon) 15-34,

38-41, May 26, 2004; see Pl.'s Exs. 21, 23, 25, 26, 27.) Madison and Westway executed five

written assignments (the "Assignments") with respect to Madison's purchase of the Subject

Accounts. (PTO, Ex. A ¶¶ 24-28; Pl.'s Exs. 21 at P000002, 23 at P000046, 25 at P000039, 26 at

P000059, 27 at P000050; Trial Tr. (Sneddon) 15-34, 38-41, May 26, 2004.) Each of the

Assignments lists Hunts Point under either "Account Name and Address" or "Customer" and

includes an invoice number and an amount. (PTO, Ex. A ¶ 23.) The first Assignment, listing an

amount of $361,590.00, was executed by Westway and dated March 1, 2000. (Id. ¶ 24.) The

second Assignment, listing an amount of $500,055.00, was executed by Westway and dated

March 16, 2000. (Id. ¶ 25.) The third Assignment, listing an amount of $437,508.00, was

executed by Westway and dated March 20, 2000. (Id. ¶ 26.) The fourth Assignment, listing an

amount of $491,492.00, was executed by Westway on April 13, 2000. (Id. ¶ 27.) The fifth

NOT FOR PUBLICATION

Assignment, listing an amount of $778,355.00, was executed by Westway on April 13, 2000.[1]

(Pl.'s Ex. 27 at P000050.) The Assignments related, in turn, to five requisitions (the

"Requisitions") issued by Westway and delivered to Madison. The Requisitions were in the

following amount – (1) Requisition dated February 28, 2000, in the amount of $361,590.00; (2)

Requisition dated March 16, 2000, in the amount of $500,055.00; (3) Requisition dated March

20, 2000, in the amount of $437,508.00; (4) Requisition dated April 4, 2000, in the amount of

$491,492.00; and (5) Requisition dated April 4, 2000, in the amount of $778,355.00. (Pl.'s Exs.

21 at P000004, 23 at P000048, 26 at P000061, 28 at P000067; Trial Tr. (Sneddon) 15-34, 38-41,

May 26, 2004.)

    In accordance with Madison's normal procedure, Sneddon forwarded Hunts Point a

notice of purchase with respect to each of the Subject Accounts (the "Notices of Purchase").

(Trial Tr. (Sneddon) 15, May 26, 2004.) Reingold, acting as the General Manager of Hunts Point,

signed a Notice of Purchase for each of the Subject Accounts. (PTO, Ex. A ¶ 37; Trial Tr.

(Reingold) 89, June 1, 2004; Trial Tr. (Reingold) 18, June 23, 2004.) Reingold testified that

when he signed the Notices of Purchase, he was authorized to do so.[2] (Trial Tr. (Reingold) 17-18,

June 23, 2004.) When Reingold signed the Notices of Purchase, the dollar amounts of the

---

[1] The Final Pretrial Order contains a typographical error, stating incorrectly the amount of the fifth Assignment as $788,355.00. (PTO, Ex. A ¶ 28.)

[2] Further, Reingold is, and was at all relevant times, responsible for all the day-to-day activities at Hunts Point, including financial affairs and operational and security matters. (Trial Tr. (Reingold) 7, June 23, 2004.) All Hunts Point department heads report to Reingold. (Id.) His responsibilities include working with Hunts Point's accountants in the preparation of financial statements, collecting rents, overseeing construction projects, including the Project, and overseeing and approving Hunts Point's payments to construction contractors. (Id. 7-10.)

-9-

NOT FOR PUBLICATION

Requisitions referenced in the Notices of Purchase already had been filled in by Sneddon. (Trial Tr. (Sneddon) 28-29, May 26, 2004; see Trial Tr. (Reingold) 18, June 23, 2004.) The first Notice of Purchase, which corresponds to the first Assignment, is dated March 1, 2000, and indicates the amount of $361,590.00. (PTO, Ex. A ¶ 31; Pl.'s Ex. 21 at P000003.) The second Notice of Purchase, which corresponds to the second Assignment, is dated March 17, 2000, and indicates the amount of $500,055.00. (PTO, Ex. A ¶ 32; Pl.'s Ex. 23 at P000047.) The third Notice of Purchase, which corresponds to the third Assignment, is dated March 17, 2000, and indicates the amount of $437,508.00. (PTO, Ex. A ¶ 33; Pl.'s Ex. 25 at P000040.) The fourth Notice of Purchase, which corresponds to the fourth Assignment, is dated April 3, 2000, and indicates the amount of $491,492.00. (PTO, Ex. A ¶ 34; Pl.'s Ex. 26 at P000058.) The fifth Notice of Purchase, which corresponds to the fifth Assignment, is dated April 3, 2000, and indicates the amount of $778,355.00.[3] (Pl.'s Ex. 27 at P000052.)

The first Notice of Purchase was executed by Sneddon on behalf of Madison, Reingold on behalf of Hunts Point, and Stephen Nigro, Westway's principal, on behalf of Westway. (Pl.'s Ex. 21 at P000003.) When Sneddon received the first Notice of Purchase signed by Reingold on March 2, 2000, he called Reingold to verify his signature. (Trial Tr. (Sneddon) 19-20, May 26, 2004.) Sneddon's contemporaneous notes on the first Notice of Purchase read: "Spoke w/Bruce Reingold 3-2-00. He verified signing attached letter." (Pl.'s Ex. 21 at P000003; Trial Tr. (Sneddon) 19-20, May 26, 2004.) According to Sneddon, the substance of his conversation with

---

[3] The Final Pretrial Order contains a typographical error, stating incorrectly the amount listed in the fifth Notice of Purchase as $788,355.00. (PTO, Ex. A ¶ 35.)

**NOT FOR PUBLICATION**

Reingold was such that "he understood this was an assignment of an invoice that Westway was giving to, assigning to Madison Financial and that [Reingold] understood the payments for that invoice were to go to Madison Financial LLC." (Trial Tr. (Sneddon) 20, May 26, 2004.) Sneddon further testified that he called Reingold as part of his usual practice, the purpose of which is "[t]o make sure that the invoice was a legitimate invoice and the money was due and payable." (Id.) Reingold did not deny the telephone call with Sneddon, but testified that he could not recall the telephone call with Sneddon. (Trial Tr. (Reingold) 26, June 23, 2004.) Telephone records admitted without objection, however, reflect a telephone call from Madison's Bridgewater office to Hunts Point's office on March 2, 2000. (Pl.'s Ex. 139 at QWEST000162; Trial Tr. (Reingold) 26-28, June 23, 2004.) The Court finds Sneddon's testimony to be credible, supported by the documentary evidence, and adopts the above as facts.

In the first Notice of Purchase, Hunts Point expressly agreed:

To induce [Madison] to provide financial services to [Westway], including without limitation the purchase of its accounts, [Hunts Point] hereby represents and warrants to [Madison] as follows:

1. As of the date hereof the amount owing on the attached invoice(s) by [Hunts Point] to [Westway], and the amount to be paid to [Madison] pursuant to the obligations of [Hunts Point] is $361,590.00. Such sum is owed absolutely and [Hunts Point] has no right to counterclaim, contra claim, setoff or any other right of deduction from such sum.

2. [Hunts Point] acknowledges that the $361,590.00 owing by [Hunts Point] to [Westway] shall be paid directly to [Madison]. This assignment may only be released by [Madison] and no action of [Westway] shall affect any of [Hunts Point's] obligations to make payment directly to [Madison].

-11-

**NOT FOR PUBLICATION**

(Pl.'s Ex. 21 at P000003). The first Notice of Purchase also provides that "[Hunts Point]

acknowledges that payment to any party other than [Madison] will not constitute payment of

indebtedness owing by [Hunts Point] to [Westway]." (Id.)

Reingold testified that Gary Parker, Westway's Vice President, had brought the first

Notice of Purchase to him and asked him to sign it so that Westway could obtain funding:

> I signed the first notice of purchase in I guess on March 1st. I had received the
> phone call from Gary Parker who I believe was the vice-president of Westway
> Industries. He told me that he was in the area, needed to talk to me and could he
> stop up and see me. And a few minutes later he pulled into the Market and came
> up to my office, and presented this piece of paper to me and asked if I would sign
> it in connection with helping Westway obtain a loan for this project. I signed the
> document at that time.
>
> . . . .
>
> I asked [Parker] at the time when he would have more people on the job.
> We were getting a little frustrated and he had made some promises to us that they
> were going to be able to start immediately. He told me they needed some money.
> Money was paid up in some other jobs. If I could sign a requisition for them to get
> a loan, they would have people there a little quicker.
>
> So in connection with that, I signed the document.

(Trial Tr. (Reingold) 102-03, June 1, 2004; see Reingold Dep. 31-32.) Reingold stated that

signing the first Notice of Purchase was in Hunts Point's interest, testifying at deposition

accordingly:

> Q.     Why did you sign the document?
>
> A.     At the time I thought I was signing a document to help Westway obtain a
> loan so they could – so they would have financing in place.
>
> Parker explained to me that me signing the document – it would take a lot

-12-

**NOT FOR PUBLICATION**

of pressure off of Westway and allow them to continue to provide manpower on the job as needed.

Q.      Would that have been in Hunts Point's interest?

A.      Yes.

Q.      Was it in Hunts Point's interest for you to sign this document?

MR. PERKINS:          Objection.

A.      It was certainly in Hunts Point's interest to make sure that Westway was able to staff the job properly. By signing the document, that is what I thought I was doing.

(Reingold Dep. 34:13-35:6.) At trial, Reingold confirmed his earlier testimony:

Q.      When Mr. Parker handed you that first notice of purchase, you knew that you were signing a document to help Westway obtain a loan so that they could get financing in place, correct?

A.      That's what I believed, yes.

Q.      You also knew that by signing that document it would take a lot of pressure off of Westway and allow them to continue to provide manpower on the job, correct?

A.      That's what Mr. Parker expressed to me, yes.

Q.      And that was all in Hunts Point's interest, was it not?

A.      What was in Hunts Point's interest?

THE COURT:          To keep the job going, in effect.

THE WITNESS:          Certainly. I did not want the job shut down.

Q.      You were also aware that Westway would use the documents you signed to obtain interim financing, correct?

**NOT FOR PUBLICATION**

> A.      That's what I believed, yes.
>
>          . . . .
>
> Q.      Did the job continue after you signed these things?
>
> THE WITNESS:      Yes.

(Trial Tr. (Reingold) 20-21, June 23, 2004.)

Reingold conceded that it was not his practice not to read documents before he signed

them on behalf of Hunts Point. (Trial Tr. (Reingold) 19, June 23, 2004.) Notwithstanding his

substantial experience and responsibilities, Reingold testified that he did not read the first Notice

of Purchase before he signed it:

> Q.      Did you read the document?
>
> A.      I really didn't.
>
> THE COURT:      What did you just say?
>
> THE WITNESS:      I really did not. I didn't read it. I had no reason to believe
> what he was telling me would be incorrect. I took him at his word. I thought it was
> going to be something that would help him do the job a little bit quicker and I
> signed the document.
>
>          . . . .
>
> Q.      Did you notice in the document a reference to an entity called Madison
> Financial LLC?
>
> A.      Once again I really didn't read it and I certainly never saw that it matters.

(Trial Tr. (Reingold) 104-05, June 1, 2004.) Reingold testified further about his conversation

with Parker: "I don't think it took 2 minutes because [Reingold] was walking out of the door and

NOT FOR PUBLICATION

[Parker] was walking in and [Parker] said did you sign this for me and [Reingold] signed it and [Reingold] just kept walking." (Id. 105.) Reingold did not keep a copy and did not tell anyone that he had signed it. (Trial Tr. (Reingold) 19, June 23, 2004.)

As stated Hunts Point, Westway, and Madison executed four additional Notices of Purchase. (Pl.'s Exs. 23 at P000047, 25 at P000040, 26 at P000058, 27 at P000052.) The second and third Notices of Purchase were executed about March 17, 2000, and the fourth and fifth Notices of Purchase were executed about April 3, 2000. (Pl.'s Exs. 23 at P000047, 25 at P000040, 26 at P000058, 27 at P000052; Trial Tr. (Reingold) 107-09, June 1, 2004.) The terms of the second, third, fourth, and fifth Notices of Purchase are identical to the terms of the first Notice of Purchase, except that each Notice of Purchase references a different invoice amount due to Madison. (Pl.'s Exs. 21 at P000003, 23 at P000047, 25 at P000040, 26 at P000058, 27 at P000052.) As with the first Notice of Purchase, Reingold did not read the other Notices of Purchase before he signed them, nor did he keep copies of them. (Trial Tr. (Reingold) 19, June 23, 2004.) Reingold also did not tell anyone at Hunts Point that he had signed the Notices of Purchase. (Id.)[4] The Court finds so.

**6.     Madison's Advance of Funds to Westway**

Once Sneddon obtained the Notices of Purchase and Assignments for each of the Requisitions, Sneddon forwarded "funding requests" to Brewer-Rossi. (Pl.'s Exs. 21, 23, 25, 26, 27.) Plaintiff's exhibit 21, for example, is Sneddon's funding request with respect to the first

---

[4] Madison also forwarded Hunts Point a sixth notice of purchase, corresponding with a sixth assignment, for Hunts Point to execute, but Reingold refused to sign it. (PTO, Ex. A ¶¶ 36, 39.) Madison is not seeking recovery on this sixth notice of purchase. (Id. ¶ 38.)

NOT FOR PUBLICATION

Notice of Purchase. It consists of the documents obtained and assembled by Sneddon and then

forwarded to Brewer-Rossi before Madison advanced any funds on the Requisition dated

February 28, 2000. (Trial Tr. (Sneddon) 15-23, May 26, 2004.) The package included a cover

page entitled "Funding Request," the first Assignment, the first Notice of Purchase, the

Requisition dated February 28, 2000, and a Dun & Bradstreet report on Hunts Point.[5] (Pl.'s Ex.

21.) In accordance with his usual procedure, Sneddon sent this funding request and all the

attachments to Brewer-Rossi, who was responsible for the funding. (Trial Tr. (Sneddon) 21-22,

May 26, 2004; Trial Tr. (Brewer-Rossi) 11-13, June 1, 2004.) Sneddon followed the same

procedure and submitted funding requests for each of the Subject Accounts. (Trial Tr. (Sneddon)

15-41, May 26, 2004.) Each of the funding requests submitted by Sneddon with respect to the

Westway accounts, including the Subject Accounts, are reflected in Plaintiff's exhibit 38, which

is a chart prepared by Sneddon. (Pl.'s Ex. 38; Trial Tr. (Sneddon) 23-25, May 26, 2004.)

     After receiving Sneddon's funding requests for the Subject Accounts, Brewer-Rossi

arranged to "fund" the requests by arranging a wire transfer from Madison to Westway for

approximately 70% of the face amounts of the Requisitions. (Trial Tr. (Sneddon) 21-22, May 26,

2004; Trial Tr. (Brewer-Rossi) 9-13, 17, June 1, 2004.) Those wire transfers were made in March

and April 2000. (Stip. Am. PTO; Trial Tr. (Brewer-Rossi) 11-13, June 1, 2004.) Madison

advanced to Westway a total of $1,798,300.00 for the Subject Accounts. (Stip. Am. PTO ¶¶

54-58; Pl.'s Ex. 64; Trial Tr. (Brewer-Rossi) 13-14, 16-18, June 1, 2004.) By wire transfers dated

---

[5] Sneddon obtained the Dun & Bradstreet report to check on the financial condition of
Hunts Point. (Trial Tr. (Sneddon) 21, May 26, 2004.)

NOT FOR PUBLICATION

March 13 and 15, 2000, Madison transferred to Westway, against an invoice amount of $361,590.00, the sum of $253,113.00. (Stip. Am. PTO ¶ 54.) By wire transfer dated April 3, 2000, Madison transferred to Westway, against an invoice amount of $437,508.00, the sum of $306,205.60, plus an additional $50.00, which was applied to pay the wire transfer fee. (Id. ¶ 55.) By wire transfer dated April 6, 2000, Madison transferred to Westway, against an invoice amount of $500,055.00, the sum of $349,988.50, plus an additional $50.00, which was applied to pay the wire transfer fee. (Id. ¶ 56.) By wire transfers dated April 20 and 24, 2000, Madison transferred to Westway, against an invoice amount of $491,492.00, the sum of $343,944.10, plus an additional $100.00, which was applied to pay the wire transfer fees. (Id. ¶ 57.) By wire transfer dated April 26, 2000, Madison transferred to Westway, against an invoice amount of $788,355.00, the sum of $544,798.50, plus an additional $50.00, which was applied to pay the wire transfer fee. (Id. ¶ 58.) In accordance with its usual practices, Madison did not advance any funds on the Subject Accounts until after it had received the fully executed Notices of Purchase for those Subject Accounts. (Trial Tr. (Brewer-Rossi) 12-13, June 1, 2004.)

      **7.**    **Hunts Point's Cessation of Payment**

At no time before September 2000, did anyone from Hunts Point ever advise Madison of any problems with Westway or under the Westway Contracts. (Id. 18-19.) Sneddon testified that at the time he received the Assignments and the Notices of Purchase for the Subject Accounts, he had no knowledge that Westway was in default of its obligations to Hunts Point or that any of the Requisitions were false or fraudulent. (Trial Tr. (Sneddon) 41, May 26, 2004.) Marozzi, Brewer-Rossi, and Maguire have also testified to the same. (Trial Tr. (Marozzi) 19-21, March 3, 2004;

**NOT FOR PUBLICATION**

Trial Tr. (Maguire) 45-46, May 27, 2004; Trial Tr. (Brewer-Rossi) 18-19, June 1, 2004.)

For a period of several months, from April 2000 until September 2000, Hunts Point made regular payments on the Notices of Purchase. (PTO, Ex.A ¶¶ 40-41.) The payments were made by checks made payable to Westway, which were endorsed to Madison. (Id.; Pl.'s Ex. 60.) The following Hunts Point checks made payable to "Westway Industries" were endorsed to Madison:

| Hunts Point Check Number | Date | Amount |
| --- | --- | --- |
| 14958 | 4/12/00 | $ 375,975.00 |
| 15093 | 5/18/00 | $ 388,850.00 |
| 15202 | 6/14/00 | $ 343,550.00 |
| 15310 | 7/25/00 | $ 250,190.00 |

(PTO, Ex. A ¶ 40.) Madison has credited these payments to the Westway-Hunts Point account with respect to the amounts owed under the Subject Accounts. (Trial Tr. (Brewer-Rossi) 18, June 1, 2004.) Hunts Point also made two additional payments by checks made payable to Westway that were endorsed to "Service Capital Corporation:"

| Hunts Point Check Number | Date | Amount |
| --- | --- | --- |
| 15439 | 8/15/00 | $ 25,278.00 |
| 15557 | 9/20/00 | $ 238,219.74 |

(PTO, Ex. A ¶ 41.) Another check, number 15192 dated 6/14/00, in the amount of $60,000.00, was drawn by Hunts Point to the order of "Westway Industries" and was endorsed by the same.

-18-

**NOT FOR PUBLICATION**

(Id. ¶¶ 42-43.)[6]

Madison never authorized Hunts Point to pay Westway directly for the amounts due on the Notices of Purchase, which provided by their terms "that payment to any party other than [Madison] would not constitute payment of indebtedness owing by [Hunts Point] to [Westway]." (Pl.'s Exs. 21 at P000003, 23 at P000047, 25 at P000040, 26 at P000058, 27 at P000052.) Brewer-Rossi explained how Madison's records reflected the payments it received on the Westway-Hunts Point account. (Trial Tr. (Brewer-Rossi) 26-39, June 1, 2004.) She explained the Westway "reserve" account and stated that whether or not an invoice was "closed" on Madison's books for purposes of Westway's reserve had no bearing on Hunts Point's obligations to pay it. (Id. 23-25, 30-32.) There is no reason for the Court to deny credibility to her testimony and explanation.

It was not until September 2000 that Madison became aware of any problem with respect to Westway's work on the Project. (Trial Tr. (Sneddon) 41, May 26, 2004.) By facsimile dated September 11, 2000, Sneddon forwarded a sixth notice of purchase to Westway for signature by Westway and Hunts Point for a new $233,000.00 advance that Madison was making to Westway. (Pl.'s Exs. 30, 40.) Hunts Point refused to sign this notice of purchase. (Trial Tr. (Sneddon) 41, May 26, 2004; see Pl.'s Exs. 39, 41.) Relying on its having received the preceding Notices of Purchase, Madison erroneously funded this sixth advance before it received an executed notice of purchase. (Trial Tr. (Marozzi) 16, March 3, 2004.)

---

[6] Madison has agreed to credit the sum of $200,000.00 to the Westway-Hunts Point account and reduce its damage claim by that sum, based on its receipt of a cashier's check in that amount dated September 25, 2000. (PTO, Ex. A ¶ 46.)

NOT FOR PUBLICATION

Hunts Point made its last payment to Westway on or about September 20, 2000. (PTO, Ex. A ¶ 42.) Reingold admitted that by October 16, 2000, he had approved payments by Hunts Point to Westway of just over $2 million on the Westway Contracts. (Trial Tr. (Reingold) 12, June 23, 2004.) By letter dated October 5, 2000, Hunts Point formally took the position that Westway was in default on the Westway Contracts. (PTO, Ex. A ¶ 48; Def.'s Ex. 5; Trial Tr. (Reingold) 13, June 23, 2004.) By letter dated October 12, 2000, however, Westway responded that it was not in default. (PTO, Ex. A ¶ 49; Def.'s Ex. 6.)

By letter dated December 20, 2000, titled "Notice of Assignment and Request for Payment," Madison advised Westway's account debtors, including Hunts Point, that Westway had defaulted on its obligations under the Purchase Agreement. (Pl.'s Exs. 9, 10.) In the letter, Madison also advised the account debtors that all sums due to Westway were to be paid directly to Madison. (PTO, Ex. A ¶ 50; Pl.'s Ex. 9.) Thereafter, one or more representatives of Madison contacted Hunts Point and demanded payment on the Subject Accounts. (Trial Tr. (Marozzi) 5-8, March 3, 2004.) Notwithstanding Madison's demands, Hunts Point has not paid the remaining amounts due on the Notices of Purchase. Brewer-Rossi calculated the total amount due to Madison by Hunts Point on the Subject Accounts as $1,010,435.00. (Id. 22; Trial Tr. (Brewer-Rossi) 37-39, June 1, 2004.)

### 8. Maguire's Fraud and Crimes Against Madison

During 1999 and 2000, Madison had approximately fifteen to twenty customers, including Westway. (Pl.'s Ex. 64.) In September 2000, Marozzi and Brewer-Rossi met with Maguire and Sneddon to ask them to explain certain defaulted account payments. (Trial Tr.

NOT FOR PUBLICATION

(Marozzi) 26-27, March 2, 2004.) Brewer-Rossi called several account debtors herself to

investigate the situation. (Id.) Brewer-Rossi learned that Maguire had falsely represented to some

account debtors that he was the sole owner of Madison and that payments should be made

directly to Service Capital. (Id.) Brewer-Rossi reported such to Marozzi, and they continued to

investigate the matter, eventually determining that Maguire had stolen and diverted from

Madison hundreds of thousands of dollars. (Pl.'s Ex. 55; Trial Tr. (Marozzi) 26-31, March 2,

2004.)

      In November 2000, Marozzi and Brewer-Rossi confronted Maguire with their findings,

and he confessed to stealing funds from Madison and promised to repay Madison and Marozzi

for all the money that he had taken. (Trial Tr. (Marozzi) 28-31, March 2, 2004.) Maguire and

Service Capital Corp., L.L.C. executed a consent judgment in favor of Madison that was entered

in the Superior Court of New Jersey on February 2, 2001, for $1,300,000.00. (Pl.'s Ex. 58.)

Maguire was terminated and barred from conducting any further business on behalf of Madison.

(Pl.'s Ex. 4 at 2.) On November 7, 2001, Maguire was indicted by a New Jersey Grand Jury on

first-degree money laundering charges, second-degree theft by deception and bad check charges,

and related offenses in connection with the money that he stole from Madison. (Pl.'s Ex. 54)

Maguire was arrested and later convicted of a felony. (Trial Tr. (Maguire) 48, May 27, 2004.)

<h2 style="text-align:center">CONCLUSIONS OF LAW</h2>

      Plaintiff Madison asserts two claims alleging liability on the part of Defendant Hunts

Point for the amounts due on the Subject Accounts – (1) common law breach of contract based

on Hunt Point's defaults under the Notices of Purchase; and (2) collection of accounts under

-21-

**NOT FOR PUBLICATION**

Article 9 of the UCC.[7] New Jersey statutory and common law governs.

### 1.    Liability

Plaintiff offers two theories of recovery under its first claim – (1) breach of contract; or (2) in the alternative, promissory estoppel.

### A.    Breach of Contract

Madison argues that the Notices of Purchase constitute valid and enforceable contracts among Madison, Hunts Point, and Westway. Hunts Point's primary defense, however, is that the Notices of Purchase were not supported by consideration.

According to the Notices of Purchase, Hunts Point agreed to pay Madison specified amounts "absolutely" with "no right to counterclaim, contra claim, setoff or any other right of deduction." (Pl.'s Exs. 21 at P000003, 23 at P000047, 25 at P000040, 26 at P000058, 27 at P000052.) And, at trial Reingold admitted that he signed the Notices of Purchase with full authority. (Trial Tr. (Reingold) 17-18, June 23, 2004.) Yet, Hunts Point notes that Westway already was obligated to perform under the Westway Contracts. As a result, Hunts Point maintains that new consideration was required to support the waivers of defense received by Madison from Hunts Point, as part of the Notices of Purchase.

Basic contract principles "render a promise enforceable against the promisor if the promisee gave some consideration for the promise." Martindale v. Sandvik, Inc., 173 N.J. 76, 87

---

[7] Because the Court concludes that in the case of a finding of liability under Article 9, damages would be no greater than those for liability for breach of contract, the Court refrains from determining whether Article 9 provides an additional basis for relief.

**NOT FOR PUBLICATION**

(2002). As such a waiver of defense "to be operative, must be supported by an agreement founded on a valuable consideration." W. Jersey Title & Guaranty Co. v. Ind. Trust Co., 27 N.J. 144, 152-53 (1958) (quotation omitted). The consideration "may take the form of either a detriment incurred by the promisee or a benefit received by the promisor." Cont'l Bank of Pa. v. Barclay Riding Acad., Inc., 93 N.J. 153, 170 (1983). There is no threshold that the consideration must meet, however, given that the New Jersey Supreme Court has stated that "[a] very slight advantage to one party, or a trifling inconvenience to the other, is a sufficient consideration to support a contract when made by a person of good capacity, who is not at the time under the influence of any fraud, imposition or mistake." Martindale, 173 N.J. at 87-88 (citations and quotations omitted). "[T]he consideration 'must merely be valuable in the sense that it is something that is bargained for in fact.'" Borbely v. Nationwide Mut. Ins. Co., 547 F. Supp. 959, 980 (D.N.J. 1981) (quoting 1 Corbin on Contracts § 131 (1963)).

On cross-examination Reingold admitted that he signed the first Notice of Purchase "to help Westway get a loan and do the job quicker." (Trial Tr. (Reingold) 17, June 23, 2004.) Reingold stated that while Hunts Point's trade contracts provide specified mechanisms for contractor payments that require approval by Reingold and Hunts Point's construction manager and architect, in practice city and state agencies also have to approve payments, extending the time for contractors to receive payments beyond what is in their agreements:

> Q.    Now, you also testified last time that you had advised bidding contractors that there could be a lag time between 30 and 60 days in the payment process because of the review and approval process by the city and state agencies. Do you recall that?

**NOT FOR PUBLICATION**

A.      Yes.

Q.      That was in respect of Hunts Point seeking its reimbursement?

A.      Yes.

Q.      The reason you told the contractors that was because, wasn't it, that in their trade contracts there was no provision for delays while Hunts point [sic] had to wait on city and state agencies for its reimbursement?

A.      That's correct.

(Trial Tr. (Reingold) 16-17, June 23, 2004.) Reingold agreed that "if someone reviewed the trade contracts, they would have no way of knowing that those delays would or could occur while Hunts Point waited for reimbursement." (Id. 17.) As such, Reingold said that he signed the Notices of Purchase because he thought that it was in the best interests of Hunts Point to keep the Project moving along. (Id. 20-21.) Moreover, Reingold testified on cross-examination that it was in Hunts Point's interest to sign the Notices of Purchase because it would enable Westway to keep the job going and to obtain interim financing:

Q.      You also knew that by signing that document it would take a lot of pressure off of Westway and allow them to continue to provide manpower on the job, correct?

A.      That's what Mr. Parker expressed to me, yes.

Q.      And that was all in Hunts Point's interest, was it not?

A.      What was in Hunts Point's interest?

THE COURT:          To keep the job going, in effect.

THE WITNESS:          Certainly. I did not want the job shut down.

-24-

NOT FOR PUBLICATION

Q.      You were also aware that Westway would use the documents you signed to obtain interim financing, correct?

A.      That's what I believed, yes.

(Id. 20.)

The Court holds that the Notices of Purchase were supported by consideration. Specifically, the Court finds that the benefit that Hunts Point received was in the form of the interim financing that Madison provided to Westway, purportedly enabling Westway to continue its work on the Project in the face of payment delays by Hunts Point due to the review and approval process by city and state agencies.[8]

New Jersey law supports this conclusion, though the factual context of caselaw differs somewhat from this case. As example, in Continental Bank, a defendant mortgagor agreed to arrange a mortgage on its property, in exchange for the plaintiff's continuing to extend credit and providing a two-week bridge loan to third parties. 93 N.J. at 161-62. The New Jersey Supreme Court held that the mortgage was supported by sufficient consideration "when the entire transaction between [the plaintiff, the third parties, and the defendant] is considered as a whole." Id. at 174. According to the New Jersey Supreme Court, "[t]he mortgage was simply part and parcel of the overall transaction. . . . [which] included, inter alia, an additional $1 million line of credit . . . as well as the $350,000 two-week bridge loan." Id. Similarly, if the Court considers the

---

[8] Furthermore, the Court finds that the written consent required for assignment of the Subject Accounts under Article 7 of the Westway Contracts, (see Def.'s Exs. 1, 2; Trial Tr. (Reingold) 22, June 23, 2004), was given by Hunts Point through Reingold's signature on the five Notices of Purchase, (Pl.'s Exs. 21 at P000003, 23 at P000047, 25 at P000040, 26 at P000058, 27 at P000052).

NOT FOR PUBLICATION

transaction between Madison, Westway, and Hunts Point as whole, Hunts Point benefits from

Madison's providing the funds to Westway because it eliminated any construction delays caused

by the city and state review and approval process.

This conclusion is further supported by the decision of the District of Connecticut in

Brookridge Funding Corp. v. Northwestern Human Services, Inc., Civ. Action No. 99-2339,

2007 U.S. Dist. LEXIS 46975 (D. Conn. June 26, 2007) ("Brookridge (2007)"), a case that

involved very similar facts to this case.[9] In Brookridge a plaintiff factor (like Madison) provided

funding to a customer (like Westway) in exchange for certain accounts receivable after entering

into an "acknowledgment" with the customer and the defendant account debtor (like Hunts

Point), verifying the amount that the account debtor owed and that the amount was due

absolutely (or, alternatively, that the account debtor waived any defenses). Brookridge (2004),

2004 U.S. Dist. LEXIS 16788 at *2-11. The Brookridge defendant argued that the

acknowledgment was unenforceable due to lack of consideration. Brookridge (2007), 2007 U.S.

Dist. LEXIS 46975 at *3. The Brookridge court concluded that the acknowledgment was

supported by consideration because "[t]he benefit [the account debtor] received from the

_____

[9] Brookridge is particularly notable in this case because Hunts Point had relied upon an earlier ruling by the Brookridge court in support of its argument that the Notices of Purchase lacked consideration. See Brookridge Funding Corp. v. Nw. Human Servs., Inc., 175 F. Supp. 2d 355, 363-64 (D. Conn. 2001). Since this bench trial concluded, the Brookridge court has held its own bench trial, Brookridge Funding Corp. v. Nw. Human Servs., Inc., Civ. Action No. 99-2339, 2004 U.S. Dist. LEXIS 16788 (D. Conn. Aug. 18, 2004) ("Brookridge (2004)"), has had its judgment vacated and the case remanded back to district court, Brookridge Funding Corp. v. Nw. Human Servs., Inc., No. 05-3678, 170 Fed. Appx. 170 (2d Cir. 2006), and has issued another ruling on liability, damages, and prejudgment interest, Brookridge (2007), 2007 U.S. Dist. LEXIS 46975.

NOT FOR PUBLICATION

agreement was [the factor's] promise to advance financing to [the customer] in lieu of [the account debtor's] being required to satisfy its own debt obligations to [the customer] – certainly a benefit to which [the account debtor] was not entitled previously." Brookridge (2007), 2007 U.S. Dist. LEXIS 46975 at *8.

Because the Court finds that the Notices of Purchase were supported by consideration, the Court concludes that they are valid and enforceable contracts.[10]

### B.       Promissory Estoppel

Even if the Notices of Purchase had not been supported by consideration, they are nevertheless enforceable under the doctrine of promissory estoppel, under which "a promisor is barred from denying enforceability of his promise for lack of consideration," provided certain elements are satisfied. Ballard v. Schoenberg, 224 N.J. Super. 661, 666 (App. Div. 1988). These elements of promissory estoppel are:

> (1) a clear and definite promise by the promisor; (2) the promise must be made with the expectation that the promisee will rely thereon; (3) the promisee must in fact reasonably rely on the promise and (4) detriment of a definite and substantial nature must be incurred in reliance on the promise.

---

[10] Additionally, Hunts Point argues that the Notices of Purchase should not be enforced because the Requisitions were not attached, despite that the Notices of Purchase referenced such attachments, rendering the Notices of Purchase ambiguous. The Court finds Hunts Point's failure to attach the Requisitions to be immaterial because exact dollar amounts were indicated in the Notices of Purchase. (Pl.'s Exs. 21 at P000004, 23 at P000048, 26 at P000061, 28 at P000067; Trial Tr. (Sneddon) 15-34, 38-41, May 26, 2004.) Indeed, at trial, both on cross-examination and in response to questioning by the Court, Reingold admitted that the Notices of Purchase were not "blank" and that it was "more likely than not that there was an actual figure there" when he signed them. (Trial Tr. (Reingold) 18, June 23, 2004.) This is also supported by testimony from Sneddon. (Trial Tr. (Sneddon) 9-10, 28-29, May 26, 2004.)

NOT FOR PUBLICATION

The Malaker Corp. Stockholders Protective Comm. v. First Jersey Nat'l Bank, 163 N.J. Super.
463, 479 (App. Div. 1978). Each of the elements is satisfied here.

"A clear and definite promise," the first element, is "the [s]ine qua non of a promissory
estoppel claim." Zarrilli v. John Hancock Life Ins. Co., 231 Fed. Appx. 122, 124 (3d Cir. 2007)
(quoting Malaker Corp., 163 N.J. Super. at 479). And, by their plain terms, the Notices of
Purchase evidence clear and definite promises by Hunts Point in favor of Madison. In each
Notice of Purchase, Hunts Point promised that it would pay the specified amounts "absolutely"
with "no right to counterclaim, contra claim, set off or any other right of deduction from such
sum" and that the amount stated would be paid to Madison. (See, e.g., Pl.'s Ex. 21 at P000003.)

With respect to the second element, the Court concludes that the promise was made with
an expectation that Madison would rely on the Notices of Purchase. The Notices of Purchase
expressly provide that Hunts Point's representations were made "to induce [Madison] to provide
financial services to [Westway]." (Pl.'s Exs. 21 at P000003, 23 at P000047, 25 at P000040, 26 at
P000058, 27 at P000052.) That Mr. Reingold did not bother to read the Notices of Purchase, or
to read them carefully, (Trial Tr. (Reingold) 104-05, June 1, 2004), is no defense. "The fact that
[a party] did not choose to read the paper, or the material parts of it, before signing, or did not
know its contents at the time, cannot, in the absence of actual fraud, relieve him from its
obligations." Silvestri v. S. Orange Storage Corp., 14 N.J. Super. 205, 212 (App. Div. 1951)
(quotation omitted); see also Gras v. Assocs. First Capital Corp., 346 N.J. Super. 42, 56 (App.
Div. 2001) ("Failing to read a contract does not excuse performance unless fraud or misconduct
by the other party prevented one from reading.").

-28-

NOT FOR PUBLICATION

The evidence indicates that Reingold received actual notice of Madison and its connection to the Notices of Purchase. Sneddon testified to calling Reingold on March 2, 2000, (Trial Tr. (Sneddon) 19-20, May 26, 2004), which is also reflected in Sneddon's contemporaneous notes, (Pl.'s Ex. 21 at P000003). In addition, supporting telephone records from Qwest confirm that on March 2, 2000, a call was made to Hunts Point's office from Madison's Bridgewater office, where Sneddon worked. (Pl.'s Ex. 139 at QWEST000162.) Reingold also did not deny that Sneddon called him, only stating that he could not recall. (Trial Tr. (Reingold) 26-28, June 23, 2004.) Furthermore, Reingold's testimony establishes that when he signed the Notices of Purchase, he knew that they would be provided to a lender to induce that lender to provide financing to Westway. (Trial Tr. (Reingold) 102-03, June 1, 2004; Trial Tr. (Reingold) 20-21, June 23, 2004.)

As for the third element, the Court concludes that Madison relied upon Hunts Point's promises in the Notices of Purchase and that such reliance was reasonable. The undisputed testimony of Madison's representatives establishes that Madison relied on the Notices of Purchase in purchasing the Subject Accounts and that Madison would not have purchased the Subject Accounts without them. (Trial Tr. (Sneddon) 9-10, 15-40, May 26, 2004.) Moreover, the reasonableness of Madison's reliance is evidenced by the terms of the Notices of Purchase, Sneddon's follow-up with Reingold after the execution of the first Notice of Purchase, and Madison's normal business practices.

The Notices of Purchase state that Hunts Point's representations and warranties were made "[t]o induce [Madison] to provide financial services to [Westway], including without

-29-

**NOT FOR PUBLICATION**

limitation the purchase of its accounts." (Pl.'s Exs. 21 at P000003, 23 at P000047, 25 at P000040, 26 at P000058, 27 at P000052.) These terms require Hunts Point to represent and to warrant to Madison the specific amount of its obligations and that the amount is owed "absolutely" with "no right to counterclaim, contra claim, setoff, or any other right of deduction." (Pl.'s Exs. 21 at P000003, 23 at P000047, 25 at P000040, 26 at P000058, 27 at P000052.) Despite the explicitness of the terms of the Notices of Purchase, however, Sneddon also took a further step and called Reingold to verify his signature on the first Notice of Purchase. (Pl.'s Exs. 21 at P000003, 130 at QWEST000162; Trial Tr. (Sneddon) 19-20, May 26, 2004.) This evidence alone is certainly sufficient to conclude that Madison was reasonable in relying on the promises contained within the Notices of Purchase.

Madison, however, also acted in accordance with its normal business practices, providing even more support for the conclusion that Madison's reliance was reasonable. Madison's representatives testified that when an account debtor was a private entity, it was Madison's normal practice to obtain a signed notice of purchase and, for any new account debtor, to verify the signature on the notice of purchase. (Trial Tr. (Sneddon) 9-10, 15, 19-20, May 26, 2004.) Madison followed these procedures with respect to the Subject Accounts. (Trial Tr. (Sneddon) 15, 19-20, May 26, 2004.) Further, authorization for a wire transfer to Madison's customer was only given after Sneddon sent a "funding request" to Brewer-Rossi. (Id. 8; Trial Tr. (Brewer-Rossi) 10-12, June 1, 2004.) This "funding request" consisted of a package of documents, which included a notice of purchase. (Trial Tr. (Sneddon) 13-14, May 26, 2004.) Again, Madison followed these procedures. (Trial Tr. (Sneddon) 15-41, May 26, 2004; Trial Tr. (Brewer-Rossi)

-30-

NOT FOR PUBLICATION

9-13, June 1, 2004.) Because Madison acted in accordance with its normal business practices with respect to the Subject Accounts, the Court concludes that its reliance on Hunts Point's promises was reasonable.[11]

Finally, there is no dispute that Madison suffered a definite and substantial detriment, satisfying the fourth element. As a result of its reliance on the Notices of Purchase, Madison advanced over $1.7 million to Westway.

The Court concludes that all four elements of promissory estoppel are satisfied.[12]

---

[11] The reasonableness of Madison's reliance is unaffected by whether sections of the Notices of Purchase were untrue. As example, although Hunts Point argues that the amounts stated in the Notices of Purchase did not accord with the actual payment requisitions submitted by Westway to Hunts Point, such discrepancies are irrelevant with respect to Madison, given that the Notices of Purchase, each of which Reingold signed, contained unambiguous dollar amounts representing the amounts owed by Hunts Point to Westway. (See, e.g., Pl.'s Ex. 21 at P000003.)

Moreover, the Court rejects Hunts Point's argument that because Madison had copies of the Westway Contracts in its files, Madison should have been on notice that the Requisitions were inaccurate because Westway could not have completed the work for which the Requisitions sought payment. First, there was no evidence adduced at trial as to when Madison obtained copies of the Westway Contracts. Second, Hunts Point and Westway had entered into Letters of Intent dated February 16, 2000 (the "Letters of Intent"), several weeks before actually executing the Westway Contracts. (PTO, Ex. A ¶ 19.) Under the Letters of Intent, Westway already was obligated to perform meaningful work at the site, and all work on the Project was to be completed by May 12, 2000. (Trial Tr. (Reingold) 24-25, June 23, 2004.) Although Hunts Point extended the construction deadlines far beyond that date, Madison was never notified of that fact. As a result, the Court finds that it was reasonable for Madison to assume that meaningful work had been performed on the Project when it purchased the Subject Accounts from Westway.

[12] To the extent that Hunts Point asserts a defense of waiver because, as it contends in its Answer, Madison "was aware of and permitted Hunts Point to pay Westway for construction labor and materials in the ordinary course and, therefore, waived any entitlement to collect any sums under the [Notices of Purchase]," the Court disagrees. Under New Jersey law, "[w]aiver is the intentional relinquishment of a known right. . . . [which] implies an election by a party to forego some advantage which he might have otherwise demanded." Farris v. County of Camden, 61 F. Supp. 2d 307, 338 (D.N.J. 1999). There was no evidence presented at trial of any

NOT FOR PUBLICATION

    **2.     Damages and Prejudgment Interest**

In a breach of contract action, "the function of damages is simply to make the injured party whole." Furst v. Einstein Moomjy, Inc., 182 N.J. 1, 13 (2004). Accordingly, the Court concludes that Madison is entitled to damages of $1,010,435.00. This figure is the result of the sum of the dollar amounts listed on the Notices of Purchases,[13] less deductions for payments received by Madison through checks endorsed to it by Westway and other credits.[14] The Notices of Purchase are the only contracts at issue in this action, and as a result, the rights and payments between Madison and Westway, as prescribed in the Purchase Agreement, are irrelevant to the Court's determination as to the proper damages due to Madison as a result of Hunts Point's breach of the Notices of Purchase. See Brookridge (2007), 2007 U.S. Dist. LEXIS 46975 at *19-20.

Moreover, the Court concludes that it is inappropriate to deduct any additional amounts from the damages award as a result of payments made by Hunts Point to Westway that were endorsed to Service Capital.[15] First, these funds can be characterized as having been

---

intentional relinquishment of rights by Madison.

[13] The Notices of Purchase indicate amounts of $361,590.00, $500,055.00, $437,508.00, $491,492.00, and $778,355.00.

[14] Hunts Point check number 14958 (dated 4/12/00) indicates an amount of $375,975.00. Hunts Point check number 15093 (dated 5/18/00) indicates an amount of $388,850.00. Hunts Point check number 15202 (dated 6/14/00) indicates an amount of $343,550.00. Hunts Point check number 15310 (dated 7/25/00) indicates an amount of $250,190.00. In addition, Madison has agreed to credit $200,000.00 and reduce its damage claim accordingly.

[15] These payments include check numbers 15439 (dated 8/15/00) for $25,278.00 and 15557 (dated 9/20/00) for $238,219.74.

NOT FOR PUBLICATION

misappropriated by Maguire, through Service Capital, from Madison. Maguire's actions were criminal and, as such, not those of an agent because his actions were not within the scope of his employment. See Gotthelf v. Prop. Mgmt. Sys., Inc., 189 N.J. Super. 237, 240-42 (App. Div. 1983) (finding that an alleged agent's "theft would be 'outrageously criminal' and 'not in any sense in the service of the employer's interest'"). Second, the Notices of Purchase clearly state that "payment to any party other than [Madison] will not constitute payment of indebtedness owing by [Hunts Point] to [Westway]." (Pl.'s Ex. 21 at P000003.) Had Hunts Point followed the Notices of Purchase and made payments directly to Madison, Maguire never would have had the opportunity to misappropriate the funds.[16]

With respect to prejudgment interest, the Court exercises its discretion and chooses not to award it to Madison. "[T]he award of prejudgment interest on contract and equitable claims is based on equitable principles." County of Essex v. First Union Nat'l Bank, 186 N.J. 46, 61 (2006) (citation omitted). As a result, "the trial court has the discretion to grant or deny prejudgment interest." Meshinsky v. Nichols Yacht Sales, Inc., 110 N.J. 464, 478 (1988) (citation omitted); see County of Essex, 186 N.J. at 61. Although the Court recognizes that "the basic

---

[16] The Court recognizes that "[o]n a promissory estoppel claim, the prevailing party is only entitled to recover 'damages resulting from its detrimental reliance upon promises made during contract negotiations despite the ultimate failure of those negotiations.'" Cleveland Plaza Assocs. v. Conte Entm't of Cranford, LCC, 2007 WL 4372797, at *8 (N.J. Super. App. Div. Dec. 17, 2007) (quoting Pop's Cones, Inc. v. Resorts Int'l Hotel, Inc., 307 N.J. Super. 461, 470 (App. Div. 1998)). The Court has concluded that Hunts Point's liability is premised on a theory of breach of contract, but if promissory estoppel is the appropriate theory, Madison's reliance damages would be $239,734.70 – i.e., the total of all funds advanced by Madison to Westway via wire transfer, including fees, less payments made by Hunts Point to Westway that were endorsed to Madison, including the $200,000.00 agreed-upon credit.

**NOT FOR PUBLICATION**

consideration is that the defendant has had the use, and the plaintiff has not, of the amount in question," County of Essex, 186 N.J. at 61 (quotation omitted), the Court believes that equitable considerations do not support the award of prejudgment interest. Madison advanced funds totaling $1,798,299.70 to Westway, including wire transfer fees, for the Subject Accounts. Madison has received $1,558,565.00 from Hunts Point on the Subject Accounts. Although Hunts Point's breach of the Notices of Purchase necessitates a damages award of $1,010,435.00, Madison's reliance damages are only $239,734.70. As a result the Court will not award prejudgment interest to Madison.

**CONCLUSION**

For all the foregoing reasons, the Court awards judgment in favor of Plaintiff Madison in the amount of $1,010,435.00, plus post-judgment interest and costs to be taxed.


March 17, 2008                                      **s/William H. Walls**
                                                   United States Senior District Judge